**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**DEL RIO DIVISION**

```
-------------------------------------------------x
```
PAUL BERGER, derivatively for the benefit of   :
Life Partners Holdings, Inc.,   :
   :
                **Plaintiff,**   :
   :
       **--against--**   :
   :
BRIAN D. PARDO, R. SCOTT PEDEN, DAVID   :    C. A. No. 2:12-cv-9
M. MARTIN, TAD M. BALLANTYNE, HAROLD  :
E. RAFUSE, and FRED DEWALD,   :
   :
              **Defendants.**   :
   :
        **--and--**   :
   :
LIFE PARTNERS HOLDINGS, INC.,   :
   :
         **Nominal Defendant.**   :
   :
```
-------------------------------------------------x
```

## VERIFIED SHAREHOLDER'S DERIVATIVE COMPLAINT

Plaintiff Paul Berger ("Plaintiff") alleges this Verified Shareholder's Derivative Complaint based on information and belief, with the exception of allegations concerning Plaintiff and his own acts, which are alleged on personal knowledge. This matter concerns allegations of inappropriate actuarial procedures and assumptions, and accounting fraud, by certain officers and directors of Life Partners Holdings, Inc. ("Life Partners" or "the Company"). Such conduct, which harmed Life Partners, occurred in connection with the sale of interests in life insurance policies held by sick or elderly insureds, who need immediate cash, to investors who are willing to provide that cash ("Life Settlements"). Plaintiff seeks derivatively on behalf of Life Partners

to recover damages from the responsible members of management and the Board of Directors. Counsel's investigation prior to filing this Complaint includes:

(a)     consultation with an expert who serves on an American Academy of Actuaries' "Life Settlements Investment Work Group";

(b)     consultation with a Certified Public Accountant;

(c)     a review of the Complaint filed by the Securities and Exchange Commission ("SEC") on January 3, 2012 against Life Partners and certain of its officers and directors;[1]

(d)     a study of the recent findings of the SEC Life Settlements Task Force;

(e)     a review of the civil proceedings brought in 2007 against Life Partners and its top executives by the Securities Commissioner of the State of Colorado;

(f)     an analysis of the October 31, 2011 report issued by the outside directors of Life Partners entitled, "Results of the Independent Directors' Review of Claims Asserted in the Consolidated Complaint and the Berger Demand" (the "Directors Report") , and exhibits thereto;

(g)     an analysis of assorted studies of the accuracy of estimated life expectancies made by clinical physicians who are not trained in actuarial science or in underwriting procedures;

(h)     a review of the literature concerning historical life expectancies of persons afflicted with Acquired Immune Deficiency Syndrome ("AIDS") during the period relevant to this Complaint (that is, 1999 to the present, "the Relevant Period"); and

(i)     a review of Life Partners' public filings with the SEC, and its other public statements, as well as newspaper articles concerning Life Partners and its practices.

---

[1]     *SEC v. Life Partners Holdings, Inc., et al.* Case No. 1:12-cv-00033 (W.D. Tex.-Austin Division)(JRN) (the "SEC Complaint"). A copy of the SEC's Complaint is attached hereto as Exh. A.

## SUMMARY OF THE ACTION

1.     This is a shareholder's derivative action brought by Plaintiff, an investor in Life Partners shares, for the benefit and protection of Life Partners. Life Partners is a public company, whose shares trade on NASDAQ.

2.     The defendants named herein consist of Life Partners' top executives, its Chief Financial Officer, and all members of its Board of Directors (the "Individual Defendants"). Life Partners, as described below, has suffered substantial damages and may well suffer more, as a result of the actions of the Individual Defendants. The goal of this derivative suit is to ensure that these individual wrongdoers be held directly accountable for their actions, as it is unfair and inequitable for all damages to be paid by Life Partners' public shareholders who had no role in the wrongdoing and would never have condoned it. Derivative actions serve as important role in policing corporate wrongdoing. As the U.S. Supreme Court observed in *Cohen v. Benefit Indus. Loan Corp.,* 337 U.S. 541, 547-548 (U.S. 1949):

> As business enterprise increasingly sought the advantages of incorporation, management became vested with almost uncontrolled discretion in handling other peoples money. The vast aggregate of funds committed to corporate control came to be drawn to a considerable extent from numerous and scattered holders of small interests. The director was not subject to an effective accountability. That created strong temptation for managers to profit personally at expense of their trust. The business code became all too tolerant of such practices. Corporate laws were lax and were not self-enforcing, and stockholders, in face of gravest abuses, were singularly impotent in obtaining redress of abuses of trust.

> Equity came to the relief of the stockholder, who had no standing to bring civil action at law against faithless directors and managers. Equity, however, allowed him to step into the corporation's shoes and to seek in its right the restitution he could not demand in his own. It required him first to demand that the corporation vindicate its own rights, but when, as was usual, those who perpetrated the wrongs also were able to obstruct any remedy, equity would hear and adjudge the corporation's cause through its stockholder with the corporation as a defendant, albeit a

rather nominal one. This remedy, born of stockholder helplessness, was long the chief regulator of corporate management and has afforded no small incentive to avoid at least grosser forms of betrayal of stockholders' interests. It is argued, and not without reason, that without it there would be little practical check on such abuses.[2]

3.      The recently-filed SEC Action, which is based on a lengthy investigation, follows

years of accusations by outside analysts and financial reporters that Life Partners was engaged in

an actuarial fraud, which involved underestimating the life expectancies ("LEs") of elderly or ill

insureds who sought to sell their policies for cash at a significant discount to face value ("Policy

Sellers").[3]    Such practices would have been material to both persons who invested in Life

Partners' stock ("Stock Investors") and those who bought interests in policies ("Policy Buyers").

In order to perpetuate this fraud, key insiders concealed information from outside auditors and

made misstatements to Stock Investors.

4.      Life Partners' business consists of identifying Policy Sellers, who are ill or elderly

and who are willing to sell their life insurance policies at a significant discount.   At one time, the

Company's business mainly focused on Policy Sellers who were afflicted with AIDS.   More

recently, the business has shifted to policies held by the elderly.   In a "Life Settlement", the

---

[2]      In Texas, derivative actions are governed by the provisions of Tex. Business Organizations Code § 21.551 *et seq.*   As required by Section 21.552 Plaintiff submitted a written demand to the Company specifying the alleged wrongdoing, and asking that action be taken against the malefactors.   That demand was rejected by Life Partners' non-executive directors (the "Outside Directors") on October 31, 2011 for the reasons set forth in the Directors Report.   As described herein, the Directors Report and its underlying conclusions are entitled to no deference because: (1)  Each of the Outside Directors knew of much of the underlying wrongdoing but did nothing to remedy it; (2)  The Outside Directors placed almost sole reliance in investigating this matter on the accused wrongdoers, and their subordinates, and on information they provided; (3)  The Outside Directors commissioned no independent study to review the underlying data at issue, and to ascertain the truth; (4)  The conclusions reached by the Outside Directors from the data presented and analyzed could not have been reached by any person acting in good faith; and (5)  The Directors Report is tainted by the fact that on August 31, 2011, well before the investigation concluded, the Outside Directors determined that the key wrongdoers had acted in "good faith" and agreed to indemnify them against liabilities. *See infra,* ¶¶ 114-117.

[3]      As used herein, "Policy Seller" will apply to the original insured who sold his or her policy.   On occasion , a policy that has been sold will be re-sold in the secondary market by persons who no longer wish to retain their investment ("Policy Resellers");

Policy Seller assigns the right to receive life insurance proceeds in the event of death to a pool of investors ("Policy Buyers"). These Policy Buyers acquire the right to the proceeds of the policy. The price they pay is usually a percentage of the face value of the policy, to which is added: (1) a brokerage commission; and (2) escrow funds in the amount estimated to be needed to pay the premiums that fall due from the date of purchase to the estimated demise of the Policy Seller.

5.    In connection with the transaction, Policy Buyers are provided with an estimated LE, and an estimated return on investment ("ROI"). The estimated LE is material to Policy Buyers (and their brokers) for several reasons. First, simply as a practical matter, an investment in a policy that may be expected to pay off in one year is more attractive than one that the investor may be required to hold for several years. A "fast pay off" allows the investor to enjoy quick access to his invested funds so that they may be further invested. This leads to greater overall returns over time. Second, a Life Settlement investments is much less liquid than other types of investments (such as publicly traded stocks)--individual investors are comfortable with short periods of illiquidity, but often shun illiquid multi-year investments. To the extent a Policy Buyer has regrets or needs his cash back and wishes to remarket his investment before its maturity, this becomes difficult as to policies in which the Policy Seller has already exceeded his estimated LE. Finally, when a policy exceeds its estimated LE by a year or more, Policy Buyers must contribute additional cash to pay policy premiums as they come due. During the Relevant Period, Life Partners was desirous of selling interests in many policies very quickly. Promoting "short" LEs and very high ROI's was a great marketing tool. Unfortunately, Life Partners sought to promote sales by disseminating materially erroneous LEs produced in a highly irregular manner. Any officer or director of a Life Settlements company would have known

throughout the Relevant Period that the manner in which Life Partners obtained its LE estimates was neither scientific, nor proper.

6.     Estimating LEs for the sick or elderly requires a mix of clinical input, underwriting experience and understanding of actuarial analysis. Clinical data is obtained from the insured's medical records. Actuarial analysis requires good understanding of mortality experience, demographics and the impact on mortality of future potential events. Qualified actuaries are experienced in performing mortality studies and using the data obtained for various purposes, including the construction of mortality tables. Life expectancies are determined on basis of such mortality tables. Actuaries will revalidate the results obtained from their studies and modify the mortality tables for use as emerging experience warrants. Underwriters and MD's trained and experienced in underwriting work closely with the actuary in establishing procedures and guidelines for underwriting of different cases. Many medical professionals active in life insurance underwriting are members in recognized medical professional organizations which promote continuing education and research on the topic.

7.     There are a number of respected actuaries and actuarial consulting companies which specialize in providing services to the Life Settlements industry. Life Partners hired none of these. Instead, since 1999, until very recently, its sole LE estimator has been Dr. Donald Cassidy ("Dr. Cassidy"). Dr. Cassidy is a Reno, Nevada oncologist and internist. Dr. Cassidy is not a life insurance underwriter; he has had no training as a life insurance underwriter; he is not an actuary; he has had no actuarial training; and he has never taken a course in actuarial science. He did not use a scientific database to determine what is known as "relative mortality", *i.e.*, the difference between the life expectancy that might be listed on a "life table" for all persons of the Policy Seller's age versus the "Specific Life Expectancy" for a person who has the insured's

particular medical history. Unlike what an actuary would do, in all of the years he provided LE estimates to Life Partners he never "back tested or validated" his results to see if they were reasonably accurate. Likewise, Dr. Cassidy did not adjust his procedures to improve the results obtained, something a qualified actuary would do as a matter of course.

8.     Dr. Cassidy's estimates were often, as might be expected, unreasonable. Often, they were severe underestimates. This fact did not escape the Company's Audit Committee. In February 2003, Life Partners' Audit Committee expressed concern that that the number of maturities on the policies that the Company brokered was less than expected based on the LEs that Life Partners assigned to those policies. In pertinent part, the Audit Committee's February 2003 quarterly report to Life Partners' Board of Directors stated:

> [D]iscussion was held regarding the small number of policies paying off during the nine months ended November 30, 2002. *Based on these discussions, the Committee recommended discussions with management about obtaining an independent review of this issue to determine whether adjustments are necessary to the Company's underwriting criteria.* (Emphasis added).

9.     Management ignored the request for an independent review at that time. Further, management has never acceded to the Audit Committee's request at any time, including up to the present. Despite its knowledge that an independent review was necessary, the Outside Directors (who, together, consist the membership of the Audit Committee) have never demanded that such an independent analysis be obtained. This failure, without more, constitutes reckless indifference to the truth and *prima facie* evidence of the Outside Directors' bad faith.[4]

10.     On June 22, 2007, the Securities Commissioner of the State of Colorado brought an action against the Company ("the Colorado Action"), and its two top executives, Brian Pardo ("Pardo") and R. Scott Peden ("Peden"). As the suit sought damages which represented the bulk

---

[4]     Defendant Tad Ballantyne ("Ballantyne") was Chairman of the Audit Committee in 2003, remains its Chairman today, and Chaired the Committee which issued the Directors Report.

of the Company's cash on hand, it is reasonable to infer that all of the directors knew of the Colorado Action, and its main allegations. Among other things, the Colorado Action alleged that Defendants "have actively failed to disclose material information to investors...including, but not limited to...(c) the risk associated with the [insured] living beyond determined life expectancy; (d) the rates in which the [insureds] outlived their life expectancies; (e) how life expectancy is determined...". Specifically, Colorado alleged concealment from investors of: "the high frequency rate in which [insureds] outlived the life expectancies predicted by [defendant], even though this data was available and had been filed by [defendant] with the Texas Division [sic] of Insurance."[5]

11.     Life Partners agreed to settle the Colorado Action in December 2008. The settlement involved an offer to repurchase policies sold to Colorado investors; in addition, Life Partners was required to pay policy purchasers $2.7 million in statutory interest. The total settlement price was placed at $12.8 million, which represented almost all of the Company's cash, as listed on its fiscal 2009 balance sheet.[6] Given the magnitude of this settlement, it is reasonable to infer that all of the Individual Defendants knew of the damaging facts that led to such a large resolution.

12.     Among the damaging information unearthed by Colorado was the degree to which Dr. Cassidy deviated from accepted actuarial and underwriting methods in determining the LEs Life Partners used to sell policy investments. In a deposition taken on November 21, 2008, Dr. Cassidy confirmed that: (a) he had no actuarial training; (b) that when hired to estimate LEs in

---

[5]     The reports filed with the Texas Department of Insurance show that insureds outlived Dr. Cassidy's estimates in roughly 80% of cases during the period from 2003 to 2009.
[6]     As part of an accounting restatement on November 22, 2011 an impairment charge was taken against many of these policies (and others owned by the Company). This charge reflects a loss in value resulting from the insureds outliving their estimated LEs. The SEC Action asserts that the failure to recognize such impairments earlier violated the federal securities laws.

1999 he began to do so within a day or two of his hiring although he had no prior experience in underwriting and estimating LEs; (c) he was unaware that any specialized training even existed in the field of estimating life expectancies; (d) that he was called upon to estimate LEs for many AIDS patients, but only 1% of his own patients had AIDS or HIV; (e) that he initially was only paid if his LE estimate caused Life Partners to purchase a policy; (f) he never revised his methodology or back-tested it for accuracy; and (g) that he spent three days a week reviewing medical files and preparing LEs, and that this effort involved *as many as 200 files a week.*[7]

13.     The Life Partners directors should have been shocked by this testimony. In addition to the fact that Dr. Cassidy was a non-actuary doing underwriting work, any reasonable person would be taken aback by the notion that Dr. Cassidy could review and analyze 200 complex medical histories in a three day span. That is roughly 67 a day, or 7 per hour in a 9 hour work day! How could Dr. Cassidy realistically perform this task while allocating roughly 9 minutes to each medical file and then doing a mortality analysis? The answer is that this is professionally, intellectually, and perhaps even physically, impossible. If there were any prior doubt as to whether the LE estimation process was a sham, Dr. Cassidy's testimony resolved that doubt. Still, the directors did nothing.

14.     Because Dr. Cassidy's efforts were a sham, top executives concealed harmful data from shareholders and the Company's outside auditors (two of whom withdrew their audit opinions in 2011). For example, in 2010, auditor Ernst & Young requested internal data on life expectancies. Instead of providing full data, top executives omitted 1,200 policies wherein the insureds had already outlived Dr. Cassidy's LEs.

---

[7]     Dr. Cassidy testified that he was also treating patients four days a week in his internal medicine and oncology practice, and taking no days off.

15.     On May 13, 2011, the SEC served Life Partners and its top executives with a Wells Notice. A Wells Notice is provided by the SEC to persons or companies against whom it may bring a civil enforcement action. Any party that may be charged is provided an opportunity to respond with exculpatory evidence via a "Wells Submission". On June 6, 2011 Life Partners was served with an amended Wells Notice, expanding the list of possible charges. Life Partners' Wells Submission did not persuade the SEC: it filed the SEC Action on January 3, 2012. The charges include underestimating LEs, inflating revenues, misleading and threatening outside auditors, and disseminating false statements to shareholders. Among other things, the SEC seeks civil penalties; disgorgement of insider trading profits; the return of executive bonus compensation to the Company due to the accounting restatement; and injunctive relief.

16.     In addition to the SEC Action, Life Partners faces a class action by investors seeking damages for violation of the federal anti-fraud laws, and a class action by Policy Buyers, seeking damages.

17.     By this action, Plaintiff seeks to place the burden of paying damages where it belongs--on the shoulders of the Individual Defendants.

### JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs and the dispute is between citizens of different states.

19.     This action is not brought collusively to confer jurisdiction on this Court that it otherwise would lack.

20.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Life Partners is incorporated in Texas and because the acts and offenses pertinent to the causes of

action stated herein were committed in the Western District Texas. In addition, related actions are already pending in the Western District of Texas--Del Rio Division.

## THE PARTIES

21.     Plaintiff is a current owner of Life Partners shares, and owned shares at the time of the commission of the wrongful acts of which he complains. Plaintiff is a citizen of the District of Columbia. Plaintiff has standing to bring this action under Texas Business Organizations Code § 21.553, as Plaintiff made a demand for relief, and did not file this action until after the 91st day following the submission of that demand. Plaintiff likewise has standing under Texas Business Organizations Code § 21.559 in that he alleges with particularity herein why the directors who rejected his demand were not independent and disinterested, and did not conduct a reasonable, good faith investigation of the allegations.

22.     Nominal Defendant Life Partners is a Texas corporation with its principal place of business at 204 Woodhew Drive, Waco, Texas 76712. Life Partners describes itself as "the world's oldest and one of the most active companies in the United States engaged in the secondary market for life insurance, commonly called life settlements." Since its incorporation in 1991, Life Partners has completed over 137,000 transactions for its worldwide client base of over 28,000 high net worth individuals and institutions in connection with the purchase of over 6,400 policies totaling approximately $3 billion in face value. Its stock trades publicly on the NasdaqGS market under the symbol, "LPHI."

23.     Defendant Brian D. Pardo ("Pardo") is a Director, President and CEO of Life Partners, and the founder and CEO of its principal subsidiary, Life Partners, Inc. Pardo directly and indirectly owns 50.3% of Life Partners Holdings, Inc. In July 1989, the SEC filed a complaint against Pardo and his company, ASK Corp. of Waco, Texas, alleging that they

11

materially overstated the company's revenues and profits in public filings. Pardo resolved the enforcement action by consenting to the entry of a permanent injunction enjoining him from future violations of antifraud provisions and from aiding and abetting SEC reporting violations. From 2007 to 2009, Pardo profitably sold $11.5 million worth of LPHI stock, during which time he was in possession of material, adverse, non-public information. In addition, Pardo had a strong incentive to increase the Company's cash flow as he owns approximately 50% of the outstanding shares, and was the chief beneficiary of Life Partners' generous stock dividend policy. In recent years, dividends paid to Pardo total over $21 million. According to the Company's website, Pardo "has been certified as an expert in the field of life settlements and has testified as an expert witness on that subject on numerous occasions." Pardo is a citizen of Texas.

24.     Defendant R. Scott Peden ("Peden") has served as a Director, General Counsel, and Secretary of Life Partners since 2000. Since its incorporation in 1991, Peden has served as Vice President and General Counsel of Life Partners, Inc. Peden is an attorney and has been licensed to practice in Texas since 1990. According to the Company website, Peden "has been certified as an expert in the field of life settlements and has testified in court and before legislators on that subject on many occasions." Peden is a citizen of Texas.

25.     Defendant David M. Martin ("Martin") has served as the Chief Financial Officer for Life Partners Holdings, Inc. since February 2008. Martin is a Certified Public Accountant, licensed in Texas since 1984. Martin is a citizen of Texas.

26.     Defendant Tad M. Ballantyne ("Ballantyne") has served as a Life Partners director since 2001. Since in or about 2002, Ballantyne has served as the chairperson of the Audit Committee. Ballantyne is a sophisticated business person, and a financial expert. He

holds a Bachelor of Science degree in business management from the University of Wisconsin. He is an officer and/or director of several private companies including Hoopeston Foods, Inc. (Chief Executive Officer), Mackay Limited Partnership (Director), and Thomsen Group, LLC (Director). Mr. Ballantyne also serves as the Deputy Chairman, a non-executive director, and a member of the audit committee and the remuneration and nomination committee of Creat Resources Holding Limited, an Australian mining company (listed on the LSE/AIM as: CRHL.L); as a non-executive director and financial expert for Empire Energy Corporation International (OTCBB: EEGCE); as a director of Jimei Jimei Foods Ltd., a private company in Changchun China; as an advisory board member of TCIB Investment Company, Ltd., a private company in Beijing, China; as Chairman of CapSalus Corporation, a health and wellness company (OTCBB: WELL.OB); and as a non-executive director of American Lorain Corporation, an integrated food manufacturing company located in Shandong, China (AMEX: ALN). Ballantyne is a citizen of Wisconsin.

27.   Defendant Harold E. Rafuse ("Rafuse") has served as a Life Partners director since 2006. Rafuse is currently serving as chairperson of the Compensation Committee and is a member of the Audit Committee. Rafuse is a citizen of Texas.

28.   Defendant Fred Dewald ("Dewald") has served as a Life Partners director since 2003. Dewald is currently a member of both the Compensation Committee and the Audit Committee. Dewald is a citizen of Texas.

**FACTUAL ALLEGATIONS**

I.   **The Life Settlements Industry**

29.   The Supreme Court case of *Grigsby v. Russell,* 229 U.S. 1491 (1911) established a policy owner's right to transfer an insurance policy. Justice Oliver Wendell Holmes noted in

his opinion that life insurance possessed all the ordinary characteristics of property, and therefore represented an asset that a policy owner could transfer without limitation. This opinion placed the ownership rights in a life insurance policy on the same legal footing as more traditional investment property such as stocks and bonds. Thereafter, as with these other types of property, a life insurance policy could be transferred to another person at the discretion of the policy owner.

30. Life settlements, as an industry, may be traced back to the 1980's and the onset of the AIDS epidemic in the United States. In the 1980's, AIDS victims faced an extremely short life expectancy. Often, these individuals owned life insurance policies they no longer needed and could benefit from access to policy funds. Although a cash value was available from the life insurance company under these policies it did not take the market long to realize that it could offer to pay a fraction of the death benefit but more than the cash value for such a policy in exchange for policy ownership, and anticipate a very good rate of return when the insured dies and the death benefit is received by the purchaser. It was under these circumstances that the first such "viatical" settlements occurred. Such transactions helped ailing persons access needed funds. They also presented an opportunity to reap large returns as policies bought at a substantial discount to face value could be expected to mature quickly due to the insured Policy Sellers' limited LEs.

31. For Policy Buyers, the most crucial factor was the insured's LE. For Policy Buyers, the most crucial factor was the insured's LE. Even small deviations from the expected LE could have major investment consequences. For example, a Policy Buyer who purchased a policy with an expected two year LE would see his expected return cut in more than half if the insured outlived that estimate by as little as two years. Not only was the expected return less in

such a case, but the Policy Buyer would be required by contract to pay two years of unexpected premiums to keep the policy in force, often at hefty rates. Thus, from the beginning, the life settlement industry had a strong incentive to promise and promote the sale of policies with short LE estimates attached to them, as this created strong demand for this type of investment.

32. The industry grew rapidly from its inception in the 1980's. By 2001, it involved over $2 billion in transactions. In the late 1990's, however, advances in the treatment of AIDS led to lengthening LEs. This development caused many LE companies to shift their business to senior citizens who were elderly, but not necessarily terminally ill. The option of selling a policy was often brought to a senior citizen's attention by professional advisors, including attorneys, accountants, financial planners, or insurance agents. By 2008, the industry had grown in size to $12 billion in transactions. In recent years transactions have substantially declined due to two factors: the onset of the recession which has served to dry up investable funds, and negative publicity surrounding the practices of "life settlement agents" such as Life Partners.

## II.    Life Partners' History and Business Practices

33. Life Partners, Inc. ("LPI"), the Company's principal operating subsidiary, was founded in 1991 by defendant Pardo. Today, Life Partners is considered to be one of the oldest life settlement agents, and is the only company dedicated to this business whose shares are publicly traded. It originally focused its business on policies owned by AIDS patients (known in the industry as "viaticals" or "viaticals settlements"), but now has shifted focus to policies being sold by senior citizens. Since its inception, Life Partners claims to have facilitated 131,000 transactions involving 6,400 policies totaling over $2.8 billion in face value. Life Partners does not usually invest in policies itself. It does own a substantial numbers of policies, however, which it was forced to acquire as a way of resolving disputes (including those policies it acquired

15

to resolve the Colorado Action). While some life settlement agents serve the institutional market, Life Partners focuses on the "retail" market" consisting of individual investors.

34.  Policies for sale are usually identified and offered by persons who act as life settlement brokers. Life Partners considers Policy Buyers to be its customers, and its role to be that of "purchasing agent." In its public filings, Life Partners states that:

> A purchaser's investment return from a life settlement depends on three factors: the difference between the policy face amount and purchaser's cost basis (consisting of the acquisition cost and premiums paid to maintain the policy), the length of the holding period, and the demise of the insured. We price settlements based on a combination of the policy face amount, the anticipated life expectancy of an insured and policy maintenance costs. (Form 10-K, Nov. 22, 2011, p.6).

35.  A Policy Buyer, before purchase, is provided with a short summary describing the Policy Seller, summarizing his or her age and health issues, and containing an estimate of life expectancy. If the Policy Buyer is interested, he may purchase all or (more commonly) a fractional share of the policy. The purchase price consists of a discount to the policy's face value. The Policy Buyer must also contribute to an escrow fund that will be used to pay premiums to keep the policy in force. Should the insured outlive the estimated LE, this depletes the escrow, and the Policy Buyer must contribute additional funds to pay premiums to keep the life insurance policy in force. A final cost for the buyer is a brokerage fee, which varies widely in amount. Life Partners' fee is the difference between the purchase price from the Policy Seller and the price paid by the Policy Buyer.

36.  A Policy Buyer is most interested in what profit he can make, referred to as his return on investment ("ROI"). Even a small deviation from the estimated LE can drastically affect returns. For example, an investor may purchase a policy with a 3 year LE, and an expected 30% overall return (10% per year based on simple interest). Should the insured live

five years, the 30% overall return now declines on an annual basis to 6% per year based on simple interest, 40% less than expected. In addition, any additional monies the Policy Buyer will have paid to cover policy premiums due for the additional two years that the insured lived beyond the LE estimate will further reduce the overall return and the return rate that the investor will obtain.

37.     Further reasons investors demand reasonably accurate LE estimates include the illiquid nature of this type of investment: an investor with a three year investment horizon may not wish to see his money tied up for five, six, or even seven years. Finally, there are lost opportunity costs, as funds tied up in one type of investment cannot be used to purchase another.

38.     Creating a reasonable life expectancy estimate for people of varying ages with many health problems is not a simple matter that can be relegated to untrained amateurs in the field. Any director or officer of a Life Settlements Agent such as Life Partners would be well-aware that hiring an untrained person to perform LE estimates would be highly improper. Companies that specialize in calculating reasonable LEs (Known as "Life Expectancy Providers" or "LEPs") for the life settlement industry are well-known. LEPs employ a cadre of actuaries, statisticians and clinical doctors (usually specialists in every major field with prior relevant underwriting experience), who are conversant and familiar with actuarial mortality models and concepts.

39.     The Individual Defendants employed none of these companies. Rather, they placed sole reliance on Dr. Cassidy, who was not a trained LEP nor a trained medical insurance underwriter familiar with actuarial principles and practices, and whose results according to insurance department filings were wildly inaccurate. LPHI continued to employ him, even though such a practice led to the Colorado Action, as well as increasing scrutiny of the Company

17

by investigative reporters and regulators. Most incredibly, the directors placed sole reliance on Dr. Cassidy *even though Dr. Cassidy stated on each report that he prepared that he was not to be to relied upon as the sole source of an LE estimate.*

### III.    The Science of Life Expectancy Estimation

#### A.    General Principles

40.    The science of life expectancy estimation was originally developed by the life insurance industry. Drawing on the expertise of actuaries, medical insurance underwriters, statisticians and clinical physicians, systems were set up to enable insurers to make reasonable estimates of the life expectancy of particular individuals. In the early days, insurers would take basic life expectancy tables and apply "debits" or "credits" to the average expectancy, so as to adjust for an applicant's particular medical condition and history, as well as family history. Over time, it became clear that these methods were too simplistic: clinical experience showed that LE could be affected by having multiple risks that caused accelerated mortality or, on the other end of the spectrum, that certain ailments behaved differently in older persons, having less of an effect on longevity than originally believed. Using long-terms studies and other detailed information on "relative risks", insurers developed specialized computer models that refined the science of life expectancy.

41.    Today, the life expectancy analysis process involves a sensitive weighing of dozens (and in more sophisticated analysis, hundreds) of data points which are translated into debits and credits which then are used to ascertain how a specific client's life expectancy is likely to play out in terms of a median (*e.g.*, years and months) and how it will differ—if at all— from other similar age and gender lives.

42.     In the life settlements industry, the process as applied by the five major companies who serves as LEP's is even more refined, as Policy Sellers often differ from the general populations. The differences were most pronounced when most Policy Sellers were afflicted with AIDS. In recent years, most sellers were elderly. Life insurance companies less frequently sell policies to elderly individuals--most of their experience is with young or middle-aged applicants. Thus, LEP's pay special attention to studies and that shed greater light on life expectancy trends in the elderly, and on the longevity effects of the most common diseases of old age (such as Alzheimer's).

43.     LEP's (unlike what was done by Dr. Cassidy, as discussed below) do not rely heavily on general government population life expectancy tables. Population tables measure mortality of the entire population segment as opposed to just insured lives who have been underwritten for life insurance. Population tables will exhibit higher mortality rates, therefore lower survival rates and lower life expectancies than mortality tables that are based only on insured lives. Thus LEPs will not usually rely on government population tables as these will skew the LE toward the low end. One mortality table based on *insured* lives is the Valuation Basic Table (VBT Tables) which many LEPs use. The VBT Tables are prepared by the Society of Actuaries and are the recognized tables for establishing reserves, which are one of the liabilities in a life insurance company's balance sheet to their financial statements. During the Relevant Period, the tables in use were the 2001 VBT Table and the 2008 VBT Table.

44.     While LEP's differ somewhat in approach, these differences are not significant, and most achieve a high accuracy record based on actual mortality over a given period versus expected mortality over a given period. This "Actual-to-Expected" ratio is an acceptable method for gauging the fair accuracy of a group of life expectancy estimates.

**B.** **Standard Professional Practices in Assessing Life Expectancy**

45.     As an initial matter, information about a client's functional status and medical, family, and personal history must be gathered. That information can be collected by the life expectancy company itself or by a comprehensive phone interview with the client, and/or by obtaining what are called APSs (Attending Physician Statements) or APQs (Attending Physician Questionnaires) from doctors, a clinic, or hospital. If the insured seems from this review to be a good candidate for a Policy Sale, then actual medical records are obtained.

46.     A medical "abstractor" prescreens, reviews and highlights the medical record using a proprietary underwriting manual, and forwards findings and the records to an underwriter. The abstractor confirms both that the data is current and that the records are for the correct person. Pertinent records, diagnostic test results, and clinical records are highlighted based on underwriting manual guidelines. The abstractor supplies the underwriter with a worksheet containing the "debits and credits" culled from the records as well as comments.

47.     The underwriter will then focus on those problems most likely to affect survival. Among the facts typically examined are the individual's gender and build (i.e., height and weight), family medical history (father, mother, siblings, and children), "social habits" (tobacco, alcohol, drugs, and level of exercise and social activity and travel), cardio, cerebral, and peripheral vascular issues, pulmonary problems, renal and genitourinary, gastrointestinal, hematological, cancer, neurological/psychiatric, orthopedic/rheumatologic, autoimmune, disorders of thinking and emotion, and others. Emphasis is placed on what is likely to cause the individual to die sooner rather than later.

48.     The records and worksheet are re-reviewed by a team leader or other senior underwriter (or if the work was done by a senior level underwriter, it is approved by that person).

Regular and random audits are also performed at all levels. Debits and credits are at this point entered into the software program which will generate a final result.

49. The debits and credits are applied against the mortality tables to produce a mortality multiplier and mortality curve. The interplay between medical conditions and how various debits and credits drive the mortality multiplier may be built into system logic along with features such as the erosion of debits and credits over time ("age-based debiting"), the impact of time elapsed since onset of a condition ( "elapsed time debiting"), mortality credits, co-morbidity logic, and debits and credits impacted by functionality.

50. A Life Expectancy Report is then generated. The report may express LE as a single number or provide a range.

51. Using these refined methodologies, LEP's report a high degree of overall accuracy in their LE, as measured by the Actual to Expected ratio that they produce for their cases.[8]

IV. **Dr. Cassidy's Unscientific Methodology**

A. **His Deviation from Reasonable Methods and Doubts as to His Credibility**

52. Dr. Cassidy was deposed in the Colorado Action in 2008. In preparing their report (and most likely as early as 2008), the Life Partners directors had access to his testimony, and reviewed it. They nonetheless absurdly concluded that everything had been done properly.

---

[8]     In responding to Plaintiff's demand, the Life Partners directors called on no expert in life expectancy estimation, and no expert in "back test" evaluation. As they knew this was an area in which expert analysis was required to understand the data, this failure demonstrates unreasonable behavior and lack of a good faith investigation. Dr. Cassidy's data were never tested against an Actual to Expected ratio. The public data (including reports to the Texas Department of Insurance) showing Dr. Cassidy's estimates to be grossly wrong was never addressed. **[REDACTED PENDING DECISION ON MOTION TO FILE UNDER SEAL]**
]

53.     Cassidy testified as follows: Life Partners initially received its LE reports from Dr. Jack Kelly of Reno, Nevada. When Dr. Kelly, who was a co-founder and an investor in Life Partners died suddenly in 1999, Dr. Cassidy, his medical partner, took over this process. Cassidy had no experience or training in actuarial science or LE analysis. He did not even know any specialized training existed. He obtained his position when, at Dr. Kelly's funeral, he met defendant Pardo for the first time and told Pardo he thought he could do what Kelly was doing. Within one or two days, he was preparing LEs.

54.     Cassidy prepared LEs after what he testified was a thorough review of a patient's medical records, which could range in size from a few pages to over 1,000 pages. He worked on these reports three days a week. His reports would include a summary of the applicant's medical situation, and an estimate of LE, expressed as a range of years. At the time of his deposition, Dr. Cassidy was preparing up to 200 reports in a three day span, or (based on a 10 hour day), six to seven reports an hour. This is roughly nine minutes per report, which would include review of all medical records, analysis of all pertinent factors, and the preparation of a written report. It does not take an expert to realize what Dr. Cassidy describes is humanly impossible, and that his testimony is incredible. What seems more likely is that the bulk of the reports were not prepared by Dr. Cassidy at all; any person evaluating such testimony in good faith could only reach a similar conclusion.

55.     Supposedly, Cassidy prepared his reports based on his many years of medical experience, using some form of debit system based on an insured's medical history. Instead of using a VBT table based on insured lives and a standard debits table used in the industry, Cassidy used a governmentally-prepared HHS population mortality table. As the SEC explains (SEC Cplt. ¶ 35):

22

The HHS table is a census table that addresses life expectancies for the entire U.S. population. In contrast, mortality tables used by actuaries in the life settlement industry address mortality rates for a select portion of the population who have been underwritten for insurance. LE estimates based on data provided in the HHS table are typically shorter than LE estimates based on data in tables tailored to insured populations. Cassidy's practice of using a census table to assess life expectancy deviates from the standard practice in the life settlement industry.

56. Dr. Cassidy should have been using a VBT table. In fact, defendants represented to the public that he was using such a table, even though they knew this was false.

57. The vast mortality differences between a governmental table measuring all mortality and an industry-standard VBT Table and a refined medical underwriter's table are stark:

### Mortality Tables

| Male Age | LE | Expected Age | Female Age | LE | Expected Age | Women outliving men in years |
|---|---|---|---|---|---|---|
| | | | Social Security Table | | | |
| 55 | 24.0 | 79.0 | 55 | 27.5 | 82.5 | 3.52 |
| 65 | 16.3 | 81.3 | 65 | 20.0 | 85.0 | 3.65 |
| 70 | 13.0 | 83.0 | 70 | 15.5 | 85.5 | 2.5 |
| 75 | 10.0 | 85.0 | 75 | 12.0 | 87.0 | 2.05 |
| 80 | 7.4 | 87.4 | 80 | 9.0 | 89.0 | 1.57 |
| 85 | 5.3 | 90.3 | 85 | 6.4 | 91.4 | 1.14 |
| | | | 2008 VBT | | | |
| 55 | 31.2 | 86.2 | 55 | 33.3 | 88.3 | 2.08 |
| 65 | 22.8 | 87.8 | 65 | 25.0 | 90.0 | 2.28 |
| 70 | 18.6 | 88.6 | 70 | 20.7 | 90.7 | 2.09 |
| 75 | 14.7 | 89.7 | 75 | 16.4 | 91.4 | 1.75 |
| 80 | 10.9 | 90.9 | 80 | 12.5 | 92.5 | 1.58 |
| 85 | 7.2 | 92.2 | 85 | 8.6 | 93.6 | 1.41 |
| | | | Medical Underwriter's Table 2008 | | | |
| 55 | 34.3 | 89.3 | 55 | 37.7 | 92.7 | 3.33 |
| 65 | 24.7 | 89.7 | 65 | 28.3 | 93.3 | 3.66 |
| 70 | 20.2 | 90.2 | 70 | 23.9 | 93.9 | 3.75 |
| 75 | 16.9 | 91.9 | 75 | 19.4 | 94.4 | 2.49 |
| 80 | 13.0 | 93.0 | 80 | 15.3 | 95.3 | 2.33 |
| 85 | 9.8 | 94.8 | 85 | 11.8 | 96.8 | 2.08 |

58. As shown above, the difference in LE for a female of 70, using a proper table differs by as much as eight years from the governmental table. Using a governmental table is a sure recipe for underestimating LEs.

59.    In each report, Dr. Cassidy advised that he was not be relied upon as the sole source of LEs.  Nonetheless, the Defendants recklessly employed Dr. Cassidy as the sole source of LEs.  The Audit Committee knew as early as 2003 that independent review was needed due to the pervasive miscues in estimating LEs, but when management failed to commission such a review, they opted to stay silent.  Thus, each member of the Audit Committee bears a substantial personal share of responsibility for the damages Life Partners has suffered, and will suffer, and cannot logically claim to be either independent or disinterested.

B.    **Evidence of Dr. Cassidy's Errors**

60.    It is evident that the Audit Committee was monitoring Dr. Cassidy's performance no later than 2003.  Indeed, the need for such monitoring by the Audit Committee is fairly implied by its charter.  As the accuracy of LE estimates was central to Life Partners' business, as well as the accuracy of its financial statements and its compliance with laws and regulations, it may be reasonably inferred that the Audit Committee was well-aware of Dr. Cassidy's questionable record.

61.    In February 2003, Life Partners' Audit Committee expressed concern that that the number of maturities on the policies that the Company brokered was less than expected based on the LEs that Life Partners assigned to those policies. In pertinent part, the Audit Committee's February 2003 quarterly report to Life Partners' Board of Directors stated:

> [D]iscussion was held regarding the small number of policies paying off during the nine months ended November 30, 2002. ***Based on these discussions, the Committee recommended discussions with management about obtaining an independent review of this issue to determine whether adjustments are necessary to the Company's underwriting criteria.*** (Emphasis added).

62.     Although no independent review was ever done, as the Audit Committee knew, disturbing statistics continued to be generated.  Filings with the Texas Department of Insurance showed the following:

| Fiscal Year | Policies Exceeding LE |
| --- | --- |
| 2006 | 88% |
| 2007 | 88% |
| 2008 | 89% |
| 2009 | 90% |
| 2010 | 91% |

63.     Additionally, the overages often were not insignificant, but represented many additional years:

| Year | Number of Maturities | Avg. LE in Years | Avg. Years to Death | Avg. Understatement in Years |
| --- | --- | --- | --- | --- |
| 2007 | 106 | 2.5 | 8.2 | 5.7 |
| 2008 | 97 | 2.6 | 8.7 | 6.1 |
| 2009 | 79 | 2.9 | 8.2 | 5.3 |
| Total | 282 | | | |

64.     **[REDACTED PENDING DECISION ON MOTION TO FILE UNDER SEAL]**

65.     Thus, there is no doubt that the Directors knew Dr. Cassidy's LEs were wildly inaccurate, and decided to do nothing about it.

## V.     Legal Consequences to Life Partners From LE Misestimates

66.     The legal consequences to Life Partners due to intentionally misleading or reckless LE estimation practices are significant.  The damages they entail may even threaten the Company's viability.

### A.     Liability for Securities Fraud:

67.     Life Partners has been sued for securities fraud both by the SEC and in a class action brought by purchasers of Life Partners' stock on the open market.[9]

68.     The allegations of the SEC Complaint (Exhibit A hereto) and the private action are similar.  They allege that Life Partners repeatedly represented that mis-estimation of LE was merely a risk, when it was a reality, and that Life Partners was experienced in LE estimation.  An example of the type of language used comes from the Company's 2006 annual report on Form 10-K (emphasis added):

> *If we underestimate the average life expectancies,* our purchasers will not realize the returns they seek, demand will fall, and purchasers will invest their funds elsewhere . . . . We cannot assure you that, *despite our experience in settlement pricing,* we will not err by underestimating or overestimating average life expectancies or miscalculating reserve amounts for future premiums. If we do so, we could lose purchasers or viators and life settlors, and those losses could have a material adverse effect on our business, financial condition, and results of operations.

69.     In truth and in fact, many investors were not realizing the returns they expected. Moreover, the Company never revealed that Dr. Cassidy deviated from industry practice in preparing his LEs, and that the Company placed sole reliance on him when he instructed they should not do so.  This deviation and his poor track record was a "known trend" that the Company was required to reveal.  Outside of these public statements, Pardo and Peden represented that Dr. Cassidy made proper use of a VBT table, when they knew this was not the case, or had no idea what he used.

70.     The class action plaintiffs assert that, due to misrepresentations and omissions, the Company's stock was substantially inflated, and has since dropped to true value.  They seek substantial damages.  The SEC seeks civil penalties.

---

[9]     The securities class action is *Stone v. Life Partners Holdings, Inc, et al.,* Cause No. DR-11-CV-016-AM (W.D. Tex.).

71. As a result of these actions, the Company is suffering ongoing damages, and may yet suffer more upon their ultimate resolution.

**B.** **Liability to Policy Buyers Under State Law**

72. In the past year, Life Partners has also been sued by Policy Buyers in a class action that alleges breach of fiduciary duty, breach of contract, and state law consumer deception That action is *Turnbow, et al. v. Life Partners, Inc., et al.*, Cause No. 3:11-CV-0130-M (N. D. Tex).

73. No motions to dismiss were made as to the filed pleadings, and the matter is now in discovery, with trial scheduled for April 2013. Defense of this matter has damaged Life Partners, and Life Partners faces possible greater damages upon its resolution.

**C.** **Resolution of the Colorado Action and Kindred Repurchases**

74. As discussed above, in 2007 the Securities Commissioner for the State of Colorado sued Life Partners and its subsidiary for sale of unregistered securities, and for securities fraud relating to its LE estimates.

75. All defendants knew or recklessly disregarded the misleading nature of the Company's LEs. Had the LEs been properly prepared, it is doubtful this action would have ever been brought or, if brought, it could have been resolved on much less drastic terms.

76. The matter settled at the end of 2008 with an agreement by Life Partners to repurchase policies sold in Colorado, at a cost of $12.8 million, which included $2.7 million in statutory interest.

77. Because of the LE irregularities, these policies and other policies Life Partners has been forced to repurchase over the years are impaired, and Life Partners is obligated to pay large premium sums in the future to keep these policies in force. Life Partners only

acknowledged such impairment after being forced to restate its financial reports on November 22, 2011.

78.     In its quarterly report on Form 10-Q dated January 6, 2012, Life Partners lists impairment charges totaling $5.16 million. The Form 10-Q states at p. 8:

> Impaired value is based on estimates of life expectancy and the effect of those estimates on the cost of future premiums and the receipt of proceeds from policy maturities. *We increased the amount of actuarial data to improve our methodology for estimating life expectancy. In general, life expectancies increased with the addition of more data.* (Emphasis added).

79.     The combination of these impairment charges, plus the $2.7 million in statutory interest paid to investors, constitutes almost $8 million in damages suffered by the Company-- damages that could have been avoided had defendants herein acted lawfully.

### D.     Pardo's Overcompensation

80.     Defendant Pardo was paid generous remuneration during the Relevant Period based upon Company performance that was achieved through unlawful actions. Had the directors been discharging their duties in good faith, Pardo would (if he had been retained in his position at all) have been paid lesser sums.

81.     To the extent Pardo was overpaid, Life Partners has suffered damages, and may recover them in this derivative action.

## VI.     Accounting Irregularities

82.     The private and SEC actions assert a variety of accounting irregularities, consisting primarily of:  (a) the premature recognition of revenue, including the backdating of documents in aid of this scheme; (b) failure to write down the value of policies owned by the Company, even though it was known that the carrying value supporting the book value of those policies was based on faulty LEs; and (c) misstating accrued liabilities.

83. Plaintiff seeks damages herein for one part of this accounting scheme: the failure of defendant Martin and the Members of the Audit Committee to ensure that proper write downs were taken for the impaired value of Company-owned policies.

84. Martin and the members of the Audit Committee would have been well-familiar with the simple accounting principles concerning write-downs for the impaired value of policies. They would have, as part of their duties, read and understood the summary on p. 45 of Life Partners' 2010 annual report on Form 10-K, which stated:

> We evaluate the carrying value of our investment in owned policies on a regular basis, and adjust our total basis in the policies using new or updated information that affects our assumptions about remaining life expectancy, credit worthiness of the policy issuer, funds needed to maintain the asset until maturity, capitalization rates and potential return. We recognize an impairment on individual policies if the expected undiscounted cash flows are less than the carrying amount of the investment, plus anticipated undiscounted future premiums and capitalizable direct external costs, if any. *Impairment of policies is generally caused by the insured significantly exceeding the estimate of the original life expectancy, which causes the original policy costs and projected future premiums to exceed the estimated maturity value.* We recorded an impairment of investments in policies of $281,882 and $151,810 for the years ended February 28, 2010 and 2009, respectively. (Emphasis added).

85. The many indicia these defendants had that LEs were materially wrong are set forth above. They had a duty to alert the auditors to these facts so that a proper impairment charge could be taken. In 2011, while under investigation, these defendants suddenly realized that LEs were mis-stated, and that they should now measure the true value of the policies owned.

86. The Company's Form 10-K also reported that it had "improved" the method by which it calculated impairment on investments in policies by, among other things, increasing "the amount of actuarial data to improve our methodology for estimating life expectancy." The Company reported that, rather than relying solely on Dr. Cassidy, the Company had obtained a

second LE for each insured from an industry provider, typically 21st Services, LLC. Not surprisingly, the addition of a second, well-known LE provider which used an appropriate methodology resulted in increased LEs for insureds underlying life settlements brokered by the Company, and increased impairment expense in prior periods.

87. The November 22, 2011 restatement, as it relates to impairment of Company-owned policies, however, does not exclusively result from a refinement of the Company's estimation process, which, under GAAP, should be reported prospectively. To the contrary, the Restatement, as it relates to impairment of investments in policies, is due to misuse or conscious indifference to facts that existed at the time the previously-issued financial statements were prepared. In particular, Defendants' misuse or oversight of facts indicating that Dr. Cassidy's LEs were materially short is what caused the Company to understate impairment of investments in policies. This is why financial statements for previous periods were restated *retrospectively.*[10]

88. The failure by these defendants to ensure proper accounting has caused damages, and may cause further damages in connection with the SEC fraud action, and the private fraud class action. These defendants should be held accountable for such damages.

## VII. The Directors Did Not Conduct a Good Faith, Reasonable Investigation and Their Report is Therefore to be Treated as a Nullity

### A. The Nature of the Investigation Required

89. Case law, mainly from the State of Delaware where derivative suits are common, establishes that an investigative committee composed of directors must: (a) identify the issues it

---

[10] The directors' reliance in their Report on the fact that the outside auditors did not earlier uncover this scheme is disingenuous. First, as the SEC alleges, the auditors were materially misled as to Dr. Cassidy's LEs and crucial data was withheld from them. SEC Cplt., ¶ 127. Second, auditors are not infallible detectives, who can be expected to doubt management on all points, hire experts, and conduct forensic investigations. In a perfect world, outside auditors would catch all schemes and irregularities, but the world is imperfect. No director can defend an unlawful scheme on the ground that an auditor, acting with less than complete information, did not detect it.

has been charged with investigating; (b) gather sufficient evidence to explore the matters raised; (c) consider any biases of sources and witnesses, and act accordingly; (d) note and attempt to resolve any inconsistencies in the evidence; and (e) determine whether the evidence is of a nature the directors themselves can fairly analyze, or whether independent expert advice is necessary.

**B.      The Nature of the Investigation Conducted**

90.      The Directors Committee consisted of the three members of Life Partners' Audit Committee, defendants Ballantyne, Dewald and Rafuse.  Mr. Ballantyne has been a director since 2001, and has served as Chair of the Audit Committee for many years.  Mr. Ballantyne was apparently Chair of the Audit Committee when, in 2003, it recommended based on concerns as to the accuracy of Dr. Cassidy's LEs that an "independent review" be obtained.  As noted, such request was ignored by management at that time, and (to the best of Plaintiff's knowledge) has never been conducted to this day.  Mr. Dewald and Mr. Rafuse, the other members of the Committee, have been directors since 2003 and 2006, respectively.

91.      The Committee asserts that it had several occasions to explore allegations as to Dr. Cassidy LEs prior to embarking on this investigation, and preparing this Report.  On each occasion, the Committee members assert that they were satisfied with the responses and evidence assembled by management members to rebut the accusations.

92.      In response to Plaintiff's Demand, additional investigation was conducted.  The investigation consisted of interviews of Life Partners executives (including Messrs. Pardo, Peden and Martin) and various other Company employees.   No interview concerning LEs appears to have been conducted with Dr. Cassidy.

93.     The Committee reviewed certain documents, including print-outs purporting to list Dr. Cassidy's LEs as to certain types of policies and certain mortality experience within prescribed time frames.

94.     The Committee did not address the SEC's allegation that management misled outside auditors concerning LEs and withheld information from the auditors concerning 1,200 policies that had exceeded Dr. Cassidy's LE estimates. *See* SEC Cplt. ¶ 127.

95.     The Committee did not address the filings with the Texas Department of Insurance showing Dr. Cassidy's LE estimates to be grossly inaccurate.

96.     The Committee appears to have generated no analyses of its own, save for one chart purporting to illustrate that Life Partners' fees were not dependent on LE estimates.

97.     The Committee retained no outside independent expert on LEs, no outside actuary or statistician, and no independent review firm.

98.     The Committee did not provide its Report in draft form to Plaintiff so that he, his attorneys and his expert could comment on it, raise questions about it, or point out inconsistencies in it before it was finalized.

**C.      The Investigation Was Not a Reasonable Investigation**

**1.      Failure to Hire an Independent Expert**

99.     The determination of whether Dr. Cassidy's LE estimates were reasonably accurate can only be assessed by a qualified actuary and a qualified medical underwriter, working with sufficient underlying data.  Such an expert must have familiarity with the practices, procedures and standards of the life settlements industry, familiarity with the nuances of the

different life insurance products, familiarity with life insurance company practices and contract provisions, and, possibly also familiarity with other topics.

100. None of the directors is an actuary, a statistician or a medical underwriter. None has worked for a Life Expectancy Provider ("LEP"). The Committee Report reflects ignorance of statistical back-testing methodologies employed by experts in this field. The Committee Report takes at face value assertions by biased members of management that an expert in this field would find at best, unsupported, and at worst, false.

101. The Committee never commissioned or performed a test of Dr. Cassidy's LEs known as an Actual to Expected ratio, which is used by LEP's to measure the fair accuracy of their estimates.[11]

102. In sum, the Committee could not and did not understand the data it had, or the data it needed. It nonetheless rendered on opinion on matters well beyond its competence.

## 2. The Report is Riddled With Erroneous Conclusions

103. The Committee stated that it was satisfied with management's reactions and explanations each time the question of LE estimate accuracy was raised over the past several years.

104. The Committee's reliance on management statements and analyses is unreasonable. The Committee had to be especially skeptical of the analyses prepared by management because they were prepared only after management had, in essence, been accused

---

[11] LEPs boast that, due to their scientific methodologies, their Actual to Expected Ratios fall in the range of 100% (*i.e*, that the number of deaths in any particular period matches the number predicted for that period). **[REDACTED PENDING DECISION ON MOTION TO FILE UNDER SEAL]**

of fraud. The Committee seems to have expressed no skepticism as to anything management claimed.

105. First, the Committee relied on a purported analysis management made in 2010 that supposedly showed that Dr. Cassidy's estimates were roughly equivalent to those that would be made by 21st Services, a major LEP. The analysis made by management seems to be Exh. 9 to the Committee's Report. No raw data or back up is provided--an omission that made it impossible to verify management's calculations. What management claims to have done is to take Dr. Cassidy LEs, run them through "mortality curve" software written by the consulting firm, Milliman, and then compare the results with the curve purportedly used by 21st Services. This is not the way an expert in this field would gauge fair accuracy. Astonishingly, and never mentioned by the Committee, Milliman itself conducted a project reviewing the accuracy of LEs, and analyzed public data filed in Texas by Life Partners and another similar company, Coventry. Its conclusions, published in April 2008, were the opposite of those reached by Life Partners management:

> Actual deaths were approximately 60% of the number expected based on the life expectancies in the settlement records and the computation methods used. ... Investor returns based on settlement values using life expectancies in the data would likely be less than anticipated at pricing.[12]

106. Neither management nor the Committee asked Milliman to perform any analyses or double-check management's purported results. A reasonable Committee, acting in good faith, would have done so.

107. **[REDACTED PENDING DECISION ON MOTION TO FILE UNDER SEAL]**

---

[12] Milliman Research Report, "Life Settlement Characteristics and Mortality Experience for Two Providers," April 2008 (attached as Exh. C to this Complaint).

108. **[REDACTED PENDING DECISION ON MOTION TO FILE UNDER SEAL, INCLUDING THE CHART BELOW]**

| Year | Policy Entries | Number Over Estimate LE | Number Under Estimated LE | Pct. Over Estimated LE |
|------|----------------|-------------------------|---------------------------|------------------------|
|      |                |                         |                           |                        |
|      |                |                         |                           |                        |
|      |                |                         |                           |                        |
|      |                |                         |                           |                        |
|      |                |                         |                           |                        |
|      |                |                         |                           |                        |

43. The calculations above do not require an expert, but they do require a person acting reasonably and in good faith to examine and analyze the numbers. Such an exercise does not take more than an hour, and requires nothing more than a simple calculator. **REDACTED PENDING DECISION ON MOTION TO FILE UNDER SEAL]**

109. This trend should have shocked the Committee members rather than impelling them to award Dr. Cassidy's numbers their seal of approval. It certainly does not support the Committee's conclusions.[13] Indeed, Dr. Cassidy's results are quite possibly far worse than

---

[13] **[REDACTED PENDING DECISION ON MOTION TO FILE UNDER SEAL**

depicted above **[REDACTED PENDING DECISION ON MOTION TO FILE UNDER SEAL]**

44. As the SEC noted, when pressed by the auditors, management withheld data on 1,200 policies of this description.[14]

45. In sum, the Committee had no sound basis for its conclusions, and did not take action to acquire any. Its Report must be deemed a nullity, and disregarded.[15]

### 3. Reliance on Biased Witnesses

46. Top management--defendants Pardo, Peden and Martin--have been charged with securities fraud in a civil action by the SEC and civilly, and with breach of fiduciary duty by Policy Buyers. This does not mean they should not be interviewed, or that everything they say must be disregarded. It does mean, however, that their averments must be treated with a reasonable degree of skepticism, and that corroborating evidence should be obtained.

47. Here, management statements were accepted without question. Documents produced by management which make no sense, and which could never withstand scrutiny, were fully accepted by the Committee.

48. In these circumstances, the need for diligence, and expert advice, is heightened. The Committee grossly failed in its obligations.

### D. The Committee Members Are Not Disinterested or Independent

### 1. The Committee Members Pre-Judged This Matter

---

[14] **[REDACTED PENDING DECISION ON MOTION TO FILE UNDER SEAL]**

[15] **[REDACTED PENDING DECISION ON MOTION TO FILE UNDER SEAL]**

49.     Plaintiff's Demand was made on June 1, 2011. The Committee's Report was finalized on October 31, 2011. Many of the Committee's interviews were conducted in September and October, 2011. No decision should have been made until the Committee's work had concluded, and it had a chance to deliberate.

50.     By August 31, 2011 the Committee was not close to completing its review of the charges. Nonetheless, on that date, the Company entered into an indemnification agreement with the defendants, as announced in a September 8, 2011 SEC filing:

> Under the Texas Business Organizations Code, indemnification and the advancement of expenses is denied to a person who has not acted in good faith, has engaged in willful or intentional misconduct or who has breach his or her duty of loyalty to the enterprise. *In accordance with the indemnification agreements, the directors who are not a party to the claims in these legal proceedings have determined that the three executive officers satisfy the standards of conduct requirements under Texas law and are eligible for indemnification.* (Emphasis added).

51.     Having made this determination in advance of the Report, the directors cannot now claim independence of mind. Faced with a similar pre-judgment in *Biondi v. Scrushy*, 820 A.2d 1148, 1166 (Del. Ch. 2003), the court found that a Special Litigation Committee was disqualified for lack of independence:

> How can the court and the company's stockholders reasonably repose confidence in an SLC whose Chairman has publicly and prematurely issued statements exculpating one of the key company insiders whose conduct is supposed to be impartially investigated by the SLC? The answer is that they cannot. Even if the SLC later issues a report in favor of dismissal that reads well and that appears to be factually supported, there will always linger a reasonable doubt that its investigation was designed to paper a decision that had already been made.

52.     The same reasoning applies here. The Committee was over-eager to absolve the insiders (and perhaps themselves as well). Putting aside whether or not the decision to grant indemnification was a good one, once it had been made, the Committee members should have

recused themselves, and allowed the investigation to be conducted by someone else (such as a newly-appointed director or a special investigator). That they did not do so disqualifies them.[16]

### 2. The Committee Members Face a Significant Prospect of Liability

53. The Committee members, as directors, and as the Audit Committee, must comply with the Company's Code of Ethics and the Audit Committee Charter.

54. Under the Code of Ethics, each has pledged *inter alia* to :

(a) Provide full, fair, accurate, timely, and understandable disclosure in the Company's public communications, including reports and documents that the Company files with, or submits to, the SEC; and

(b) Comply with applicable governmental laws, rules, and regulations.

55. Under the Audit Committee Charter, the directors on that Committee shall, *inter alia*:

(a) Oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company;

(b) Insure that management has been diligent and prudent in establishing accounting provisions for probable losses or doubtful values and in making appropriate disclosures of significant financial conditions or events;

(c) Engage its own outside advisors, including legal counsel, financial advisors and experts in particular areas of accounting, as the Committee determines necessary, apart from counsel or advisors hired by management; and

---

[16] The premature determination that the insiders had acted in good faith did not have to be made by the Committee members under Tex. Business Organizations Code § 8.103(c). Instead, a determination could have been made by an appointed "special legal counsel." Thus, the Committee members' actions constitute a conscious decision to avoid review of the matters at hand by independent counsel. This, too, impugns their independence.

(d)     Cause to be maintained an appropriate regulatory compliance program covering the Company and its subsidiaries to aid compliance with the laws and regulations applicable to viatical and senior life settlement companies.

56.     In keeping with these mandates, the Audit Committee as early as 2003 identified the need for an independent outside review of Dr. Cassidy's LE estimates.  At that time, and presently, defendant Ballantyne was Chair of the Audit Committee.  Although Audit Committee members changed from time to time, it is reasonable to infer that all of its members would be aware of areas of concern that had been identified by their predecessors, and which had remained unaddressed.

57.     The Audit Committee members knew that intentional or reckless misstatements of LEs to customers was unlawful, and could lead to lawsuits and regulatory actions.  The Audit Committee likewise knew that the accuracy of LEs was integral to the Company's business, and that misstatements in this area affected the accuracy of the audited financial statements and SEC filings.  They knew that intentional or reckless misstatements of LEs could and would give rise to contingent liabilities, asset impairments, and overstatements of revenue and net income.

58.     The Audit Committee Charter, as a mandate, provides that the Audit Committee *shall* retain experts in areas in which it did not have the necessary expertise to evaluate issues that came before it, or within its purview.

59.     A director who makes important corporate decisions knowing that he lacks the full and complete information needed to make a proper decision, acts in bad faith and disloyally, when the director knows that such information may be obtained in a timely manner and at reasonable cost, but consciously fails to obtain such information.

60.     A director may be found to have committed or permitted a fraud, even if no motive to do so can ever be found or proved.

61.     The Audit Committee members were presented with multiple red flags concerning Dr. Cassidy's LE underestimates:

--They knew that the Audit Committee had identified underestimates in 2003, and had determined that these necessitated an outside independent review, which management refused to commission;

--They knew that the Audit Committee was mandated to hire experts and order such a review itself, but failed to do so;

--The Audit Committee knew, or recklessly disregarded, that the State of Colorado had confirmed its 2003 concerns about the accuracy of Dr. Cassidy's LEs and had highlighted poor performance reflected in filings made by the Company with the Texas Department of Insurance;

--The Audit Committee knew, or recklessly disregarded, testimony provided by Dr. Cassidy in 2008 which indicated that Dr. Cassidy had no training in performing LEs, and had cautioned the Company not to rely on him as its sole source for LE estimates;

--They knew, or recklessly disregarded, that Dr. Cassidy's results had never been back-tested for accuracy;

--They knew, or recklessly disregarded, that the Audit Committee did not know the standard in the life settlements industry to gauge fair accuracy of LE estimates, and that the Company had hired no expert in this area to educate them;

-- They knew, or recklessly disregarded, that no member of management was expert in assessing the accuracy of LE reports, yet they relied on management evaluations on this subject to be valid and accurate;

-- They knew, or recklessly disregarded, that management was under fire, and had reason to dissemble, but nonetheless took everything management said at face value, and demanded no outside verification.

--They continued to behave in the manner described above even after hearing Mr. Prado say, at the August 5, 2010 annual meeting *that he did not have enough information on which to base any conclusion about Dr. Cassidy's LEs for life settlements.* As a Company, Life Partners was required to have such information; and

--They have ignored, and failed to investigate assertions that management misled the outside auditors.

62.     For the foregoing reasons, the Audit Committee members acted in bad faith, and consciously disregarded their fiduciary duties. Its members face a significant prospect of liability which compels a conclusion that they are not independent and disinterested. Their Report is entitled to no deference, and must be rejected.

## FIRST CAUSE OF ACTION
### (Against Defendant Pardo for Breach of Fiduciary Duty)

63.     Plaintiff repeats and realleges all previous allegations.

64.     Pardo hired Dr. Cassidy, and knew he had no qualifications to perform LE estimates. Nonetheless, Pardo maintained him in that position, and relied on him as the sole source of LE estimates, even though Dr. Cassidy said he should not be used as the sole source.

65.     Pardo knew in 2003 that his own Audit Committee asked that an independent review of LE estimates be undertaken, and he refused to do so, in bad faith violation of his fiduciary duties.

66.     Pardo was sued in the Colorado Action in 2007, and knew of its allegations of low LE estimates. He also knew what was alleged therein regarding the Company's filings with the Texas Department of Insurance. Nonetheless, he consciously failed to investigate properly, or take any corrective action.

67.     Pardo knew it was crucial to Life Partners, and would lead to claims and regulatory action, if LE estimates were materially erroneous. Yet, as late as the August 5, 2010 annual meeting he admitted *that he did not have enough information on which to base any conclusion about Dr. Cassidy's LEs for life settlements.*

68.    Pardo has special knowledge about these issues which required him to abstain from trading his shares without full disclosure. He nevertheless traded such shares and reaped profits which in equity should be returned to the Company.

69.    Pardo knew that Life Partners' financial statements did not fairly reflect the Company's business prospects, risks and impairments, yet he approved them in knowing or reckless disregard of the truth.

70.    Pardo received and accepted compensation which was higher than it would have been had the true facts been made publicly known.

71.    For all of the foregoing reasons, Pardo has engaged in a bad faith breach of fiduciary duty, has proximately caused damages to Life Partners, and should be held accountable for those damages.

## SECOND CAUSE OF ACTION
### (Against Defendant Peden for Breach of Fiduciary Duty)

72.    Plaintiff repeats and realleges all previous allegations.

73.    Peden knew from 2000 to the present that Pardo hired Dr. Cassidy, and knew he had no qualifications to perform LE estimates. Nonetheless, Peden maintained him in that position, and relied on him as the sole source of LE estimates, even though Dr. Cassidy said he should not be used as the sole source.

74.    Peden knew in 2003 that his own Audit Committee asked that an independent review of LE estimates be undertaken, and he refused to do so, in bad faith violation of his fiduciary duties.

75.    Peden was sued in the Colorado Action in 2007, and knew of its allegations of low LE estimates. He also knew what was alleged therein regarding the Company's filings with

the Texas Department of Insurance. Nonetheless, he consciously failed to investigate properly, or take any corrective action.

76.     Peden knew it was crucial to Life Partners, and would lead to claims and regulatory action, if LE estimates were materially erroneous. Yet, as late as the August 5, 2001 annual meeting he knew that Pardo had admitted *that he did not have enough information on which to base any conclusion about Dr. Cassidy's LEs for life settlements.*

77.     Peden has special knowledge about these issues which required him to abstain from trading his shares without full disclosure. He nevertheless traded such shares and reaped profits which in equity should be returned to the Company.

78.     Peden knew that Life Partners' financial statements did not fairly reflect the Company's business prospects, risks and impairments, yet he approved them in knowing or reckless disregard of the truth.

79.     Peden received and accepted compensation which was higher than it would have been had the true facts been made publicly known.

80.     For all of the foregoing reasons, Peden has engaged in a bad faith breach of fiduciary duty, has proximately caused damages to Life Partners, and should be held accountable for those damages.

## THIRD CAUSE OF ACTION
### (Against Defendant Martin for Breach of Fiduciary Duty)

81.     Plaintiff repeats and realleges all previous allegations.

82.     Defendant Martin, in public filings with the SEC from January 2007 through November 2011, knowingly or with severe recklessness, misrepresented, failed to disclose, and/or made misleading omissions regarding: (i) a material risk to the Company's business, (ii) a

material trend impacting the Company's revenues, (iii) the Company's revenue recognition policies and (iv) the Company's net income.

83.     Martin knew of or recklessly disregarded a material risk that Dr. Cassidy's LE estimates were materially erroneous, and that such could give rise to lawsuits, contingencies, restatements, impairments, and other events that would harm the Company.

84.     Martin knew it was crucial to Life Partners, and would lead to claims and regulatory action, if LE estimates were materially erroneous.  Yet, as late as the August 5, 2010 annual meeting he knew that Pardo had admitted *that he did not have enough information on which to base any conclusion about Dr. Cassidy's LEs for life settlements.*

85.     For all of the foregoing reasons, Martin has engaged in a bad faith breach of fiduciary duty, has proximately caused damages to Life Partners, and should be held accountable for those damages.

## FOURTH CAUSE OF ACTION
### (Against the Audit Committee Members for Breach of Fiduciary Duty)

86.     Plaintiff repeats and realleges all previous allegations.

87.     The defendants herein breached their fiduciary duties in bad faith, as alleged with particularity herein.

88.     For all of the reasons set forth herein, the Audit Committee members have engaged in a bad faith breach of fiduciary duty, have proximately caused damages to Life Partners, and should be held accountable for those damages.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     As to the First Cause of Action against Pardo, damages for breach of fiduciary duty, and equitable disgorgement of unlawful gains on stock sales, and as to unjustly received salary and benefits;

B.     As to the Second Cause of Action against Peden, damages for breach of fiduciary duty, and equitable disgorgement of unlawful gains on stock sales, and as to unjustly received salary and benefits;

C.     As to the Third Cause of Action against Martin, damages for breach of fiduciary duty;

D.     As to the Fourth Cause of Action against the Audit Committee members, damages for breach of fiduciary duty, and equitable disgorgement of unlawful gains on stock sales, and as to unjustly received salary and benefits;

E.     Reasonable attorneys' fees and costs to counsel, including expert's fees; and

F.     Any such other and further relief as may be just and proper.

Dated: January 31, 2012

**PRICHARD HAWKINS MCFARLAND & YOUNG**

By: _____
      Kevin M. Young

Union Square
10101 Reunion Place Suite 600
San Antonio, TX 78216
210-477-7404
210-477-7454 (Fax)
kyoung@phmy.com

*Attorneys for Plaintiff*

45

**OF COUNSEL:**

THE PASKOWITZ LAW FIRM, P.C.
Laurence D. Paskowitz
60 East 42nd Street
46th Floor
New York, New York 10165
Telephone: (212) 685-0969
Facsimile: (212) 685-2306
classattorney@aol.com

ROY JACOBS & ASSOCIATES
Roy L. Jacobs
60 East 42nd Street
46th Floor
New York, New York 10165
Telephone: (212) 867-1156
Facsimile: (212) 504-8343
rjacobs@jacobsclasslaw.com
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I certify that on January 31, 2012, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Western District of Texas, using the electronic case files system of the court. I hereby certify that I have served all Defendants via certified mail via their counsel of record in *In re Life Partners Holdings, Inc. Derivative Litigation*, C.A. No. 2:11-cv-00043-AM (Consolidated with C.A. No. 2:11-cv-00042-AM), in the U.S. District Court, Western District of Texas, Del Rio Division:

Bruce W. Collins
Todd A. Murray
CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
*Counsel for Tad M. Ballantyne, Harold E. Rafuse, Fred Dewald,*
*and Life Partners Holdings, Inc.*

Martha Hardwick Hofmeister
Brian P. Shaw
SHACKLEFORD, MELTON & MCKINLEY, LLP
3333 Lee Parkway, Tenth Floor
Dallas, Texas 75219
*Counsel for R. Scott Peden and David M. Martin*

Roy L. Barrett
John Hawkins
Marcus Brooks
NAMAN, HOWELL, SMITH & LEE, PLLC
400 Austin Avenue, Suite 800
P. O. Box 1470
Waco, Texas 76703-1470
*Counsel for Brian D. Pardo*



Kevin M. Young

## VERIFICATION

Paul Berger, under pain and penalty of perjury under the laws of the United States, avers that as plaintiff herein he verifies that he has reviewed the foregoing Shareholder's Derivative Complaint, and that the allegations are true and correct to the best of his information, knowledge and belief.

_____
Paul Berger